CASE NO. 23-50524
UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT

_____

CANDELARIO DAVILA, on behalf of himself
and a class of those similarly situated;

ROBERT WHITE,  on behalf of himself
and a class of those similarly situated
*Plaintiffs-Appellees*

v.

PATRIOT ERECTORS, L.L.C.,
*Defendant-Appellant*

_____

On Appeal from the United States District Court for the
Western District of Texas, Austin Division
Civil Action No. AU:20-CV-00884-SH
Honorable Susan Hightower, Presiding

_____

BRIEF OF APPELLEE ROBERT WHITE

_____

Respectfully submitted:

THE LAW OFFICES OF
KELL A. SIMON

Kell A. Simon
501 North IH-35, Suite 111
Austin, Texas 78702
Telephone: (512) 898-9662
Facsimile: (512) 368-9144

**COUNSEL FOR
PLAINTIFF/APPELLEE**

## I.     CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal:

District Judge:                Hon. Lee Yeakel

Magistrate Judge:          Hon. Susan Hightower

Appellant:                      Patriot Erectors, LLC

Counsel for Appellant:   Andrea M. Johnson

Appellee:                       Robert White

Counsel for Appellee:     Kell A. Simon

Respectfully submitted,

**THE LAW OFFICES OF**
**KELL A. SIMON**

By:   /s/ Kell A. Simon
       501 North IH-35, Suite 111
       Austin, Texas 78702
       Telephone: (512) 898-9662
       Facsimile: (512) 368-9144

## II.    <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Because this appeal involves the application of well-established law interpreting the Fair Labor Standards Act, oral argument is unnecessary to aid the Court's decisional process.

### III.    <u>TABLE OF CONTENTS</u>

I. CERTIFICATE OF INTERESTED PERSONS      ………………………………i

II. STATEMENT REGARDING ORAL ARGUMENT…………...……...……ii

III. TABLE OF CONTENTS………………………………...……..……...……iii

IV. TABLE OF AUTHORITIES…...…………………………...……..……..…...vi

V.  JURISDICTIONAL STATEMENT.................................................... 1

VI. STATEMENT OF ISSUES...................................................................1

VII. STATEMENT OF THE CASE............................................................1

    A. Background and employment history.......................................1

    B. Patriot initiates a night shift, increasing White's workload.......................2

    C. Robert White worked off the clock...........................................3

    D. Patriot did not pay Robert White for hours worked off the clock.............. 7

    E. Patriot knew that Robert White worked off the clock............................... 8

        1. Eric Herzog's testimony...................................................9

        2. Other managers also knew White worked off-the-clock................11

    F. Working unpaid overtime overtime was "the Patriot way".......................13

        1. Patriot lacked training and policies regarding compliance with the FLSA, fostering a culture of uncompensated off-the-clock work.......13

        2. Mr. White believed while he worked at Patriot that he and others who worked off-the-clock were being paid correctly......................... 17

G. Robert White's estimate of his hours is reasonable and was properly accepted by the District Court..........................................................18

VIII.  SUMMARY OF THE ARGUMENT.............................................. 19

VIII. STANDARD OF REVIEW........................................................... 22

IX.   ARGUMENT............................................................................. 23

A. White established the elements of an off-the-clock FLSA claim; Patriot did not dispute White's evidence, and the district court correctly found in White's favor................................................................................. 23

1. It is undisputed that White worked off-the-clock without being compensated......................................................................23

2. It is undisputed that Patriot knew that White worked off the clock..................................................................24

3. The district court correctly accepted White's estimate of his unpaid overtime.............................................................................. 25

4. Patriot's brief does not address the district court's findings of fact or conclusions of law at all....................................................27

B. Patriot's arguments mis-state the law and attempt to create a standard that is contrary to clearly established precedent...................................29

1. White need not prove that he was "instructed" not to report his time or "prevented" from reporting it......................................... 30

2. White need not prove that he "complained" about not being paid for off-the-clock time, or told someone he was "due compensation.".....32

3. Patriot's "rules" (to the extent they exist) for reporting time make no difference when the employer knows the employee is working off-the-clock and continues to permit it, without pay........................ 35

4. White did not "deliberately evade" Patriot's policies.....................37

5. White's awareness of how to report time is irrelevant...................37

6. White's evidence is legally sufficient...........................................38

X.  CONCLUSION...................................................................................40

# IV.    TABLE OF AUTHORITIES

## Cases:

*Deloach Marine Servs., LLC. v. Marquette Transp. Co.*,
    974 F.3d 601, 606 (5th Cir. 2020)................................................22

*Fairchild v. All Am. Check Cashing, Inc.*,
    815 F.3d 959, 965 (5th Cir. 2016)................................................38

*Hobbs v. EVO Inc.*,
    7 F.4th 241, 247–48 (5th Cir. 2021)(citations omitted)..........................23, 27

*Jones-Turner v. Yellow Enterpr. Sys. LLC*,
    597 Fed. Appx. 293, 298 (6th Cir. 2015)..............................................32, 33

*Miller v. Texoma Med. Cntr.*,
    *2015 WL 5604676, at \*6 (E.D. Tex. Sept. 23, 2015*)..............................30, 31

*Newton v. City of Henderson*,
    47 F.3d 746, 748 (5th Cir. 1995)..................................................................23

*Pittmon v. CACI Int'l, Inc.*,
    No. CV2102044CJCJEMX, 2023 WL 8168834, at \*4
    (C.D. Cal. Oct. 26, 2023) ...........................................................................23

*United States Dep't of Lab. v. Five Star Automatic Fire Prot., L.L.C.*,
    987 F.3d 436, 439–40 (5th Cir.), *reh'g denied*,
    997 F.3d 1258 (5th Cir. 2021), *and cert. denied sub nom.*
    *Five Star Automatic Fire Prot., L.L.C. v. Dep't of Lab.*,
    142 S. Ct. 1667 (2022)................................................................26

*Von Friewalde v. Boeing Aerospace Operations, Inc.*,
    339 F. App'x 448, 454 (5th Cir. 2009)..........................................................40

**<u>Statutes and regulations:</u>**

Fair Labor Standards Act, 29 U.S.C. 201 ................................................................ 1

29 C.F.R. Sec. 785.13............................................................................21, 22, 33, 36

29 C.F.R. Sec. 785.11……………………………………………………….30, 32

## V.     JURISDICTIONAL STATEMENT

The district court had federal question jurisdiction under the Fair Labor Standards Act (29 U.S.C. 201, *et seq*).  Defendant did not contest the trial court's jurisdiction.  The district court entered judgment in favor of Plaintiff-Appellee Robert White on June 20, 2023.  Defendant-Appellant filed a timely Notice of Appeal to this Court.  This Court's jurisdiction thus arises under 28 U.S.C. §1291.

## VI.     STATEMENT OF ISSUES

1.     Whether the district court correctly found that Patriot Erectors violated the Fair Labor Standards Act by failing to pay Robert White for all hours worked.

2.     Whether the district court correctly determined the amount of damages it awarded Mr. White.

## VII.     STATEMENT OF THE CASE

### A.     Background and employment history

Robert White was hired by Patriot Erectors as an entry level welder in the summer of 2010.  ROA.241, 745.  He was promoted to Foreman and then to Line Leader.  ROA.241, 797-799.  After approximately two years of being employed at Patriot, Mr. White was again promoted, this time to the position of Production Manager.  ROA.241, 800.

As Production Manager, White supervised between 30 and 120 employees, and was paid hourly.  ROA.241, 801-803.  Mr. White's typical work schedule at

1

Patriot's facility in the last few years of his employment was from a little before 6:00 a.m. to at least 6:00 or 6:30 p.m. ROA.242, 808. Except for during the last three months of his employment with Patriot, Mr. White reported to Eric Herzog, Patriot's Facilities Manager. ROA.802. Herzog supervised White from 2012 until July 2019, three months before White's termination. ROA.241, 852. Patriot's CEO, Parley Dixon, is Mr. Herzog's brother-in-law. ROA.241, 799-800.

### B. Patriot initiates a night shift, increasing White's workload

After Mr. White became the Production Manager, Patriot started a night shift, initially because Patriot's parts department could not keep up with the rest of the shop. ROA.242, 803. The night shift then grew to doing "hot work" - jobs that came in in an afternoon and needed to be on-site the next day. ROA.242, 803. Mr. White's responsibility for the night shift was to help facilitate the jobs that came to the night shift and to be the go-between for project managers and site supervisors. ROA.242, 804. Many of the jobs that came to the night shift were "napkin jobs" - jobs that came in without a lot of information, and so White would help make sure the night shift employees had everything they needed to complete the job. ROA.242, 804.

### C. Robert White worked off the clock

At the Patriot facility, Mr. White would record his hours in a document on his desktop computer, and then forward his hours to Angela Luck so that he would

be paid.    ROA.242, 809-810.  Mr. White, however, only recorded and reported the hours that he worked at the Patriot facility.  ROA.242, 810.  He did not record or get paid for hours he worked after leaving the Patriot facility for the day. ROA.862. Mr. White testified that his understanding was that "My time sheet was for when I showed up 'til when I left Patriot facilities." ROA.862.

Mr. White offered detailed testimony at trial of the work he performed off-the-clock.  ROA.810-820.  It included phone calls, e-mails, text messages, and remote monitoring of activities at the Patriot facility.  ROA.810-820.  White also offered evidence of emails that he sent during off-the-clock periods.  Patriot does not dispute his testimony about the work he performed off-the-clock, and offered no evidence to contradict that testimony.

Mr. White's off-the-clock work often began as soon as he left the Patriot facility.  ROA.242, 810.  After White left for the day, he would get calls from the night shift supervisors while in the car before he arrived at home.  ROA.242, 810. Mr. White's commute home took approximately an hour, and sometimes he would be on the phone with Patriot employees for the better part of the drive.  ROA.242, 812.  If it was a long conversation, White would usually pull over.  ROA.242, 812, 875.  He even had a favorite place to pull over in Blanco, Texas, on his way home, where he would talk on the phone or send e-mails.  ROA.242, 812, 875.

3

When Mr. White arrived at home, he would spend time with his children before they went to bed, and then would work.  ROA.243, 811.  He would go through his e-mails and start tracking down any issues on the night shift. ROA.243, 811.  White testified at trial that "sometimes it was real heavy, sometimes it was very light - issues they have with the jobs, especially jobs – hot jobs, for that day." ROA.243, 811.

Though he spent time in his e-mail, Mr. White spent more time talking on his phone; he estimated that probably 25% of his time spent working at home was e-mail, and the rest was phone.  ROA.243, 819.  Mr. White used a Patriot-issued phone, and lost access to the information on it when he was fired in November 2019.  ROA.820.

Mr. White's off-the-clock phone calls varied in lengths of time, with the most calls coming in between 7 and 9 p.m.  ROA.243, 813-814.   If Mr. White received a call from Patriot at home in the evening, even if he was spending time with his family he answered it.  ROA.243, 812-813.  Sometimes calls he received at home required Mr. White to get on his work computer, get on the server, and look at or mark up drawings to send to the project manager.  ROA.243, 813.  Mr. White was also sometimes awakened in the middle of the night or early morning hours by phone calls from Patriot.  ROA.243, 813-814.

4

Not all of the work Mr. White did at home was triggered by a phone call; some was just e-mail, especially in the last few years of his employment with Patriot. He started receiving around 250 e-mails a day, so he would try to stop his regular facility management work at about 5:30 or 6:00 p.m., work on e-mail then, and then return to e-mail after he got home. ROA.243, 815-816.

Mr. White testified at trial that some e-mails he could "zip through real quick," while others needed more time, and he typically sent more than 20 e-mails from home each day. ROA.243, 816-817. Mr. White testified that the reason he answered e-mails at night was "self preservation. If I didn't answer these e-mails tonight, there would just be a lot more to filter through the next day." ROA.244, 825. Mr. White also also texted with Patriot employees on his phone after he had left the Patriot facility. ROA.244, 817.

At trial, Mr. White testified to and offered documentary evidence of some representative examples of work he performed via e-mail after he had clocked out. These included the following:

**March 21, 2018.** Mr. White clocked out at 5:30 p.m. ROA.1898. He sent e-mails at 7:57 p.m., 8:16 p.m., and 10:22 p.m. ROA.244, 821-828, 1057-1063. The 10:22 p.m. e-mail was a response to an e-mail he received at 8:17 p.m., and if he had not sent the response "they probably would have wasted a lot of time trying to figure out what they needed to get done." ROA.244, 826. To write the 10:22

e-mail, Mr. White had to get in touch with Katie Williams to make her aware "and if that was going to be okay or do we need to try a different size material, because the project manager was able to make those kinds of calls."  ROA.244, 829.

**April 5, 2018.**  Mr. White clocked out at 7:25   p.m. ROA.244, 1898, 829-830.  He sent e-mails at 7:44  p.m., 7:46 p.m., 8:02 p.m., 8:07 p.m., and 8:08 p.m.  ROA.244, 829-836, 1064-1078.

**April 26, 2018**. Mr. White clocked out at 7:01 p.m.  ROA.245, 1899, 837. He sent e-mails at 7:24 p.m., 7:26 p.m., 7:35 p.m., 7:39 p.m., 7:41 p.m., 7:50 p.m., 11:22 p.m.  ROA.245, 838-842, 1085-1097.

**April 30, 2018** - Mr. White clocked out at 6:00 p.m.  ROA.245, 247.  He sent e-mails at 8:28 p.m. and 10:34 p.m.   ROA.245, 1098-1102, 843-846. Regarding the 8:28 e-mail, Mr. White testified that it was sent in response to an e-mail he received at 6:58 p.m., where he had to open his computer, open the drawings, mark up the drawings, and then do a snippet of that marked-up selection of the drawings and copy it into the e-mail to send.  ROA.245, 844.  According to Mr. White, "[i]f we didn't address it, then it wouldn't finish that night."  ROA.245, 844.

Mr. White testified that the e-mail exhibits were representative of the kinds of e-mails that he would send while off-the-clock, except that in 2019 it got "worse" - there were more of them.  ROA.245, 850.

Mr. White had an app on his phone and on his Surface tablet that had a camera system that allowed him to watch the shop remotely.  ROA.244, 818.  He used the camera system to watch new hires at night and to make sure safety protocols were being followed, since there was no safety person at night. ROA.244, 818.

### D.      Patriot did not pay Robert White for hours worked off the clock

Mr. White's time records, reflected in Defendant's Exhibit 57 and 57A (ROA.1869-1924), do not include hours he worked at home or outside of the Patriot facility.  ROA.242, 810. As Patriot did not keep records of Robert White's unpaid overtime hours, there is no way to reconstruct Mr. White's hours accurately from documents retained by Patriot.  White used a company-issued phone; when he was let go by Patriot, he no longer had access to it, and does not know what happened to it.  ROA.243, 819-820.

Likewise, White's access to Patriot e-mail was turned off when he was let go, and he does not still have access to it.  ROA.245, 820.  Patriot produced some of White's e-mail in this litigation, but for the majority of the limitations period, the e-mails in Mr. White's "sent" items were not available because they had been lost.  ROA.245, 1019-1020.  White reviewed the e-mails produced in discovery by Patriot up to August 2018, and testified that they are not representative of all of the e-mails that he would have sent during that period in 2018.  ROA.245, 846-847.

### E.    Patriot knew that Robert White worked off the clock

Patriot had both actual and constructive knowledge that Mr. White worked off-the-clock without compensation.  Mr. White and his supervisor, Eric Herzog, talked about the fact that White worked off-the-clock without compensation.  Mr. White testified:  "I know for a fact that [Herzog] knew very well, we would talk about it, we'd commiserate about being Patriot lifers.  And [Herzog] knew very well that I worked beyond the clock in at the facility and the clock out at the facility.  And he did not talk to me about needing to get paid for that."  ROA.246, 879.  Mr. White and Mr. Herzog discussed the fact that White was working off-the-clock, and, according to Mr. White, "all upper management knew" as well.  ROA.246, 853-854.  White and Herzog "discussed it.  It's just kind of our joke of being Patriot lifers and just 'get er done' business."  ROA.246, 853-854.

White and Herzog also talked about White's pay, and the possibility of him becoming a salaried employee, but that the position would pay nowhere near what White was making just what he was claiming on the clock, and "better yet if you included the amount of time I spent off-the-clock."  ROA.246, 852.  White and Herzog joked about how much they would be paid "if we fully collected our time, if we were both on the clock" and White would say "if I truly claimed everything that I worked, I would make close to 200 without my bonuses."  ROA.246, 853.  When Mr. White and Mr. Herzog would talk about the fact that Mr. White was

8

working off-the-clock and not getting paid for it, Herzog never told him he needed to make sure he was accounting for all of his hours and getting paid for them: "it just wasn't - it wasn't - that's just what we did. . . . we were lifers and that's just what we did.  We talked about it in that sense more than any other way." ROA.246, 856-857.

### 1.    Eric Herzog's testimony

Following Mr. White's testimony, Patriot called Eric Herzog as a witness at trial.  Mr. Herzog did not deny joking with Mr. White about his uncompensated off-the-clock work, though he did not recall it specifically.  ROA.246, 1003.

Mr. Herzog testified that on one occasion, Mr. White commented to Herzog that "I don't even report all my overtime."  ROA.252, 994.  Mr. Herzog did not remember when the conversation took place, or even the year in which it took place.  ROA.252, 998.  Herzog admitted that from the conversation with White, Herzog knew that there was a period of time that White had not been paid for. ROA.253, 1001. When Mr. Herzog learned that Mr. White had not been reporting all of his time, he did not go to HR to ask them what needed to be done about the fact that there was an employee who wasn't reporting all their overtime.  ROA.253, 1000.  Mr. Herzog testified that after Mr. White disclosed that he was not being paid for all of the time he worked, he simply expected Mr. White to report all of his

hours and did not look any further into Mr. White's off-the-clock work because "he was a trusted manager of the shop." ROA.253, 995-996.

Herzog testified that when Mr. White told him that he did not report all of his overtime, he told Mr. White: "Well, if you don't have – you need to report all the time that you work." ROA.252, 994. Mr. Herzog did not tell Mr. White to go back and retroactively record his time that he hadn't clocked in for. ROA.253, 1002. Nor did Mr. Herzog remember asking anyone in Patriot's HR department to talk to Mr. White about going back and retroactively recording the time so he could be paid for it. ROA.253, 1002. After the conversation where Mr. White told him he had been working off-the-clock, Mr. Herzog never went in and checked to see whether Mr. White had logged in any time when he was working remotely. ROA.253, 1006. Nor did Mr. Herzog ever instruct anyone at Patriot to go in and check to see whether Mr. White was clocking all of the time he worked remotely. ROA.253, 1006. He said nothing further about the matter, and Herzog testified that the conversation was more about the amount of time Mr. White was working. ROA.252, 994. Mr. Herzog testified that after Mr. White told him that he did not report all of his overtime, Mr. Herzog did not do any further investigation about Mr. White's time. ROA.252, 995-996.

Mr. Herzog could not recall any further conversations with Mr. White about overtime. ROA.253, 994. When asked if Mr. White had ever told him before that

he hadn't reported all of his time, Mr. Herzog testified "not that I remember." ROA.253, 995.   Herzog admitted at trial that he had daily interaction with Mr. White between 2017 and 2019, and that he was aware that Mr. White would sometimes send e-mails from home.  ROA.248, 997, 1004.

### 2.    Other managers also knew White worked off-the-clock

White enjoyed copying upper management on e-mails he sent late, so they would know he was going the extra mile.  ROA.247, 857-858.  These included off-the-clock e-mails at 11:22 p.m. to Herzog and Ted Turner ROA.247, 1193-1194; at 8:22 p.m. to Turner, Dixon, and Herzog ROA.247, 1197-1198; at 11:23 p.m. to Herzog ROA.1205, and at 12:22 a.m. to Turner. ROA.247, 1314. ROA.247, 858-860.

Parley Dixon, Patriot's CEO, admitted that White could have been performing work for which he did not record his time.  ROA.247, 684.  When shown Plaintiff's Exh. 13 (ROA.1197-1198), an e-mail sent by Robert White to him, Eric Herzog, and Ted Turner at 8:22 pm, Dixon testified that he did not know whether Mr. White was on the clock at the time he sent that e-mail.  ROA.247, 681-682.  When Mr. Dixon would see an e-mail that Mr. White sent late at night, he did not ever inquire as to whether Mr. White was on the clock when he sent it. ROA.247, 682.  When shown other late-night e-mails, Dixon testified that he did

not know whether Mr. White was clocked in at the time he sent those e-mails. ROA.247, 682-683.

Mr. Dixon did not dispute that Mr. White's e-mails sent late at night were performing work for Patriot. ROA.248, 684. Yet Dixon never discussed with Mr. White anything about how to enter time or what time to enter. ROA.248, 685.

Mickey Swor, who was Mr. White's supervisor during the last three months of Mr. White's employment, talked to Mr. White about the number of hours he was working in general. ROA.248, 733. Mr. Swor talked with Mr. White by phone during the evenings, and texted with him then too, but did not know where Mr. White was when he was talking with him or texting with him. ROA.248, 733. Mr. Swor did not know where Mr. White was when he sent the 9:33 p.m. e-mail, and did not know whether anybody at Patriot ever gave Mr. White instruction about reporting the hours he worked if he worked them remotely. ROA.248, 734, 735. Mr. Swor also knew that White worked after he left the facility - he would call White on the phone when White was driving home. ROA.248, 857. Swor never instructed Mr. White to make sure that he was recording the hours that he worked outside of the facility. ROA.248, 857. Mr. Swor knows that hourly employees have to be paid for all hours worked, but when he became the director of fabrication services, he did not do anything to learn about how Patriot monitored

12

its compliance with the wage and hour laws requiring payment for work and overtime.  ROA.248, 731, 732.

**F.    Working unpaid overtime overtime was "the Patriot way"**

The reason Mr. White would not add hours that he worked remotely to his timesheet was that "it was just kind of the Patriot way.  I mean, we just knew that. Also, through example and through my own personal experience, it was very obvious that lifers worked those kind of hours and that that output was, like, a seed you gained later on in advancement and stuff like that."  ROA.247, 855.  White viewed off-the-clock work as "investment in my future."  ROA.247, 862.  White realized the benefit of being a Patriot lifer early on when he was a line leader; by "working extra hours" and "being available" he moved up in the company. ROA.247, 856.

**1.    Patriot lacked training and policies regarding compliance with the FLSA, fostering a culture of uncompensated off-the-clock work**

As Patriot's CEO since 2000, Parley Dixon's general job duties are to "manage the culture, provide resources, make decisions."  ROA.248-249, 672.  Mr. Dixon was aware that under the FLSA hourly employees have to be paid for all of the hours they worked.  ROA.249, 676.  Mr. Dixon became aware of that requirement when he was a craft worker on the union side of the field, and knows that there's "very straight labor laws dealing with time and timekeeping and

overtime."   ROA.249, 677.   Mr. Dixon knew as the CEO and president of the company that if employees work over 40 hours per week they have to be paid time and a half.  ROA.249, 677.  Mr. Dixon knew that Patriot had the responsibility of making sure that it was correctly capturing all of the employees' time, yet Mr. Dixon did not know if there had been training at Patriot during White's employment there that addressed making sure that off-the-clock work was being captured.  ROA.249, 678, 680.

Mr. Dixon, the recipient of many of Mr. White's late-night e-mails, did not know whether, during the time that Mr. White was an employee of Patriot, the company ever put out any written policies that said that if an employee is doing remote work, they need to report it.  ROA.249, 689.  Nor did Mr. Dixon ever instruct Eric Herzog to ensure that if Mr. White was doing remote work, he was getting paid for that time.  ROA.249, 697.

Mickey Swor, who supervised Mr. White for the last three months of Mr. White's employment, testified that he knows that the law says employers have to pay employees for all hours worked, and time and one half for hours over 40. ROA.249, 737.   But Mr. Swor doesn't know what the law says about paying employees for time they worked but didn't report.  ROA.249, 791.  He simply assumed that any employee would report any of the time he worked so he could get paid for it.  ROA.249, 791.

During his employment at Patriot, Mr. Herzog had no classroom training or online training concerning the application of wage and hour laws. ROA.253, 999. If Mr. Herzog had a question about a wage and hour issue, he would bring that question to HR. ROA.253, 1000.

Before Mr. White was the Production Manager, he did not get any training about the wage and hour laws through the company. ROA.250, 806. During the time he was Production Manager, Mr. White got no training on compliance with the wage and hour laws. ROA.250, 806. When Mr. White worked at Patriot, there were no e-mails that went out addressing timekeeping for remote work. ROA.250, 865.

At Patriot, White got safety training, harassment training, and White trained his employees on shop procedures, but there was no training about wage and hour laws. ROA.252, 979-981. Mr. White testified that there was no training or memoranda that addressed what he was supposed to do with his time if he worked remotely - "there was nothing." ROA.250, 865-866. Mr. White believed when he worked at Patriot that he reported all of his time in accordance with the law, but that only included time worked at the Patriot facility:

> Q:   With your conversations with Eric Herzog about your work time and not getting paid for remote work time, did you have the sense that you were hiding anything from him or keeping something secret that you shouldn't have been?

> A:    No.  My timesheet was for when I showed up 'til when I left Patriot facilities.

ROA.250-251, 861-862.

At trial, Mr. White was shown an undated version of Patriot's employee handbook that instructed employees to report any time worked off-site.  ROA.251. That document was not admitted as an exhibit at trial, and is not part of the record on appeal.  ROA.1382 (at Exh. 3).

Mr. White was familiar with Patriot's employee handbook, and took part in the process of editing it sometimes.  ROA.251, 864.  Mr. White testified that the language instructing employees to report any time worked off-site was not in the handbook when he worked at Patriot.  ROA.925 ("Q [by counsel for Patriot]: Again, I accept that you have a dispute that this paragraph was in the handbook.  A [by Mr. White]:   There's no dispute.  It was after.")  That testimony is consistent with the Patriot employee handbook that ***was*** offered and admitted at trial, which does not contain any language instructing employees to report time worked off-site, and was the version in effect at the time Mr. White was employed at Patriot[1].  ROA.925, 1318-1321.

---

[1] Patriot states in its Principal Brief:  "Patriot's time-recording policy (ROA.1520) also required that employees were to call in to a supervisor about off-site time, which White never did with Eric Herzog."  ROA.992. ROA.1521. ROA.925-26.   However, Patriot's time-recording policy is not contained in ROA.1520.  ROA.1520 is a daily time sheet.  ROA.1521 is also a daily time sheet.  ROA.925-26 and 992 are simply Mr. White's testimony that he did not call any supervisor about off-site time, and Mr. Swor's testimony that White did not call him to report any off-site time.

Nor did Mickey Swor know whether the out of office handbook provision was in the employee manual when he started at Patriot in July 2019, and he doesn't know when it was put in the manual. ROA.251, 790.

### 2. Mr. White believed while he worked at Patriot that he and others who worked off-the-clock were being paid correctly

While employed at Patriot, Mr. White thought he was being paid correctly, with only being paid for hours he worked at the facility. ROA.251, 943. He did not know when he worked at Patriot that the law required Patriot to compensate him for work done outside of the facility. ROA.251-252, 979.

Mr. White did not know that it was the law that if he contacted an hourly employee when they were not on the clock that they had to be paid for the time spent talking with him. ROA.250, 806. Nobody from Patriot ever told Mr. White that he needed to be keeping track of the time that he spent working while he was at home. ROA.250, 845. If Mr. Herzog had instructed Mr. White to clock all of his hours, Mr. White would have done so. ROA.249-250, 1025. If Mr. White had known that it was illegal for him to work off-the-clock, he would have reported his time. ROA.250, 865.

Mr. White knew that Candelario Davila, his night shift supervisor, worked off-the-clock, but didn't instruct him to make sure that he entered his off-the-clock time because it was the "Patriot way." ROA.252, 982 During the time he worked at Patriot, Mr. White knew of multiple Patriot employees who worked

off-the-clock, including Mr. Davila, the night shift supervisor, and Mr. White's subordinate Katelyn Reveal.  ROA.250, 883.

White expected his managers to be available whenever they were needed: "That was just part of the job."  ROA.252, 982.  Mr. White now realizes that he failed his subordinates by not making sure they were compensated for all of the hours they worked.  ROA.934.  If Mr. White had known that the company could get in trouble for having people working but not being paid for it, they would have been paid, and Mr. White would have ensured that there was training for his staff on making sure people were paid.  ROA.252, 981-982.

## G.    Robert White's estimate of his hours is reasonable and was properly accepted by the District Court

Based on his recollection of his work performed after he left Patriot's facility and clocked out, Mr. White estimated that he worked at least eight hours a week off-the-clock, and testified that that's a "very, very conservative and very, very fair estimate."  ROA.245, 847.  Based on Mr. White's testimony and the exhibits showing his hourly rates, the district court accepted Mr. White's estimate of eight hours per week.  ROA.356, 847-849.

Patriot did not dispute or contest Mr. White's good-faith estimate of his hours worked.  ROA.287-294.  Mr. White's estimate was based on both his personal recollection of his work practices, described in detail in his testimony, and supported by e-mails showing his off-the-clock work.  The two primary types of

18

evidence that could have been used to either confirm (by Mr. White) or dispute (by Patriot) that estimate - phone records showing Mr. White's calls and e-mails that he sent after hours - are (or were) in the possession of Patriot and were, with the exception of a subset of Mr. White's e-mails, not produced in this litigation. ROA.349.[2]

## VIII.  <u>SUMMARY OF THE ARGUMENT</u>

The District Court correctly decided that Plaintiff-Appellee Robert White met the elements of a claim for unpaid compensation in violation of the Fair Labor Standards Act:  (1) that he worked without compensation for the benefit of Patriot, (2) that he offered a "just and reasonable inference" of the amount of hours he worked without compensation; and (3) that Patriot had both actual and constructive knowledge that Mr. White worked off-the clock.

The first and second elements are undisputed.  Mr. White presented both testimony and documentary evidence establishing that he worked an average of eight hours per week off-the-clock after leaving the Patriot facility for the day.  He offered a detailed account of work that he performed both by phone and on his

---

[2]  Regarding the available records, the district court found: "White testified that he used his Patriot-issued phone to perform much of his off-the-clock work. He requested records from that phone in discovery, but Patriot did not produce them. White also requested his email, but Patriot produced no emails White sent after August 2018, that is, for the final fourteen months of his employment, when his workload increased."  ROA.349 (citations omitted).

computer after clocking out and leaving the Patriot facility, and supported that testimony with examples of e-mails he sent while off-the-clock. Patriot presented no evidence that White did not work the hours, or that he was paid for them.

The second prong is satisfied by Mr. White's "conservative estimate" that his off-the-clock work averaged eight hours per week, and Patriot could offer no evidence to rebut that estimate. ROA.847-848.

Regarding the third prong, the District Court correctly found that Patriot had both actual and constructive knowledge of Mr. White's off-the-clock activities. Mr. White testified that he and his supervisor, Eric Herzog, regularly discussed the fact that Mr. White worked hours for which he was not paid. ROA.350-352, 853. Mr. Herzog corroborated Mr. White's testimony, testifying to a conversation where White discussed his unpaid time with Mr. Herzog, but Mr. Herzog did nothing about it. ROA.350-352.

In its Principal Brief in this appeal, Patriot cites numerous cases that address situations where the employer had no reason to know that the employee was working off-the-clock, leading to findings that the employer did not violate the FLSA. Patriot then argues, based on those cases, that Mr. White was not "prevented" or "stopped" from reporting his off-the-clock hours, that he was aware of how to record his time at Patriot, that he did not follow Patriot's "rules", that he

never complained about not being paid for off-the-clock time, and that he intentionally hid his off-the-clock work.

Patriot's arguments based on these cases fail for two primary reasons: first, unlike the employers in those cases, Patriot did know, both actually (through White's and Herzog's conversations) and constructively (through White's after-hours e-mails to everybody in his management chain) that Mr. White was working off-the-clock. Patriot's knowledge that Mr. White was performing uncompensated work is all that is needed to establish FLSA liability: "work not requested but suffered or permitted is work time," and "[i]t is the duty of management to exercise its control and see that the work is not performed if it does not want it to be performed." 29 C.F.R. Sec. 785.13.

Second, Patriot's arguments fail because the company permitted a culture that encouraged off-the-clock work. Mr. White testified that he worked without pay because he expected to benefit from it in the future - he called it "a seed you gained later on in advancement and stuff like that." ROA.855. Patriot provided no training, guidance, or policies addressing the reporting of off-the-clock work, allowing Mr. White and his manager, Mr. Herzog, to joke about the fact that Mr. White would be a higher paid employee if he reported all of his time.

The most Patriot can offer in light of the undisputed evidence that it knew Mr. White was working off-the-clock without compensation is that Mr. White was

21

a "trusted" manager (though paid hourly) and knew how to report his time. However, the FLSA regulations state clearly that "It is the duty of management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them . . . Management has the power to enforce the rule and must make every effort to do so." 29 C.F.R. Sec. 785.13. Ultimately, Patriot's arguments collapse in the face of Mr. White's testimony that being constantly available and working without pay from home in the evenings was "the Patriot way" and was expected of him if he wanted to continue to grow with the company. ROA.855.

For these reasons, the District Court's judgment in favor of Mr. White should be affirmed.

## IX.   <u>STANDARD OF REVIEW</u>

"The standard of review for a bench trial is well established: findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Deloach Marine Servs., LLC. v. Marquette Transp. Co.*, 974 F.3d 601, 606 (5th Cir. 2020). "Under the clearly erroneous standard, we will uphold a finding so long as it is plausible in light of the record as a whole ... or so long as this court has not been left with the definite and firm conviction that a mistake has been made. . . . Thus, when the district court's account of the evidence is plausible, reversal is improper,

even if the reviewing court would have weighed the evidence differently." *Hobbs*

*v. EVO Inc.*, 7 F.4th 241, 247–48 (5th Cir. 2021)(citations omitted).

## X.    ARGUMENT

### A.    White established the elements of an off-the-clock FLSA claim; Patriot did not dispute White's evidence, and the district court correctly found in White's favor.

"An employer who is armed with [knowledge that an employee is working

overtime] cannot stand idly by and allow an employee to perform overtime work

without proper compensation, even if the employee does not make a claim for the

overtime compensation." *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir.

1995).  "To prevail on an off-the-clock claim, a plaintiff must prove (1) that he or

she worked off the clock without being compensated, and (2) that the employer

knew or should have known that the plaintiff was working off the clock." *Pittmon*

*v. CACI Int'l, Inc.*, No. CV2102044CJCJEMX, 2023 WL 8168834, at *4 (C.D. Cal.

Oct. 26, 2023); *Newton*, 47 F.3d at 748 ("In order to recover, the plaintiff must

show that he was 'employed' by the City during the periods of time for which he

claims unpaid overtime. He was employed during those hours if the City had

knowledge, actual or constructive, that he was working.").  As the district court

correctly found, Mr. White meets the elements of his claim.

**1.    It is undisputed that White worked off-the-clock without being compensated**

The district court correctly found that White worked an average of eight overtime hours per week without compensation. ROA.348-349. The court found that Mr. White's reported time did not include "any hours he worked at home or outside the Patriot facility" and that Mr. White "did not know Patriot was required to compensate employees for work done outside the facility." ROA.348-349.

**2.    It is undisputed that Patriot knew that White worked off the clock**

The district court correctly found that Patriot knew that White worked off-the-clock without compensation. ROA.350-353. The court found that Patriot's knowledge was both actual and constructive. ROA.350-353. Regarding Patriot's actual knowledge, the court held that "White and supervisor Eric Herzog both testified that they talked about the fact that White worked off-the-clock without compensation." ROA.350.

The court quoted both Herzog's testimony that he "knew at some point . . . that he had worked hours that he hadn't been compensated for" and White's testimony that "we would talk about it, we'd commiserate about being Patriot lifers. And he knew very well that I worked beyond the clock in at the facility and the clock out at the facility. And he did not talk to me about needing to get paid for that." ROA.351. Based on White's and Herzog's testimony, the district court correctly concluded that "White has met his burden to show by direct evidence that

Patriot had actual knowledge he was performing overtime work for which he was not compensated." ROA.352. The district court also found that, though Herzog's actual knowledge was sufficient to meet White's burden, Patriot also "had reason to know, and with reasonable diligence should have discovered" that White was working off-the-clock when he sent e-mails after hours to Patriot executives. ROA.352-353.

In its Principal Brief to this Court, Patriot does not deny that it had actual knowledge of Mr. White's off-the-clock activities. While Patriot cites several cases discussing the "actual knowledge" standard, and its brief contains a section entitled "Employee Must Show that the Employer Knew He was Not Being Properly Compensated," (Appellant Brief at 42), Patriot does not argue that the district court's finding of Patriot's actual knowledge was error. Nor does Patriot offer any evidence to show that finding was incorrect. Patriot merely states that it "always assumed that White . . . had recorded all of his time" (Appellant Brief at 42), without addressing the evidence cited by the district court showing actual knowledge.

### 3. The district court correctly accepted White's estimate of his unpaid overtime

Having correctly found that Patriot violated the FLSA, the district court then correctly found that Mr. White made a reasonable estimate (characterized by Mr. White as "very conservative" at trial) that he worked eight hours per week

remotely and off-the-clock, and that his estimate, uncontroverted by Patriot, was a "just and reasonable inference of his actual hours worked." ROA.350. That finding was based on "uncontroverted testimony concerning his work schedule, along with examples of emails he sent after he clocked out." ROA.353.

In response, Patriot argues that "White's claim is an 'unsubstantiated and speculative' estimate that 'does not constitute evidence sufficient to show the amount and extent of that work as a matter of just and reasonable inference.'" Appellant's Brief at 50. That is incorrect. Here, since Patriot did not keep records of the hours Mr. White worked off-the-clock, the district court was required to, and did, accept Mr. White's good faith estimate of the hours he worked off-the-clock. As the Fifth Circuit has noted:

> Seventy-five years ago in *Anderson v. Mt. Clemens Pottery Company*, the Supreme Court fashioned a burden-shifting framework for federal wage claims where an employer fails to maintain proper records. Under *Mt. Clemens*, if "the employer's records are inaccurate or inadequate," a plaintiff need only show by "just and reasonable inference" that she was an employee, worked the hours, and wasn't paid. It's a lenient standard rooted in the view that an employer shouldn't benefit from its failure to keep required payroll records, thereby making the best evidence of damages unavailable.

*United States Dep't of Lab. v. Five Star Automatic Fire Prot., L.L.C.*, 987 F.3d 436, 439–40 (5th Cir.), *reh'g denied*, 997 F.3d 1258 (5th Cir. 2021), *and cert. denied sub*

*nom. Five Star Automatic Fire Prot., L.L.C. v. Dep't of Lab.*, 212 L. Ed. 2d 577, 142 S. Ct. 1667 (2022).

And, indeed, the district court cited both pages from the trial transcript in which Mr. White discussed his off-the-clock work in great detail and the documentary evidence of e-mail sent after clocking out to support its finding. ROA. 349-350.  Mr. White's undisputed testimony established that after he left the Patriot facility and clocked out for the day, he continued working, talking by phone in his car on his way home, and continuing to do so into the evening, when he also performed work on his company-supplied tablet.  ROA.813. Mr. White also introduced evidence of e-mails that he sent after clocking out in the evening. *See* Statement of Facts, Sec. C, *supra* at pp. 5-7.  Based on that evidence, Mr. White estimated that he worked eight hours per week of uncompensated time off-the-clock, and Patriot did not dispute that estimate.  Patriot offers no evidence or argument as to the substance of Mr. White's evidence or why that evidence does would not allow a "just and reasonable inference" that he worked the hours he claims.

### 4.   Patriot's brief does not address the district court's findings of fact or conclusions of law at all.

As discussed above, "Under the clearly erroneous standard," this Court will uphold a finding so long as it is plausible in light of the record as a whole. *Hobbs*, 7 F.4th at 247–48.  Patriot does not cite to any finding of fact by the district court

that it contends was clearly erroneous.  Indeed, Patriot's entire Principal Brief in this appeal contains only one citation to the district court's Findings of Fact and Conclusions of Law - a note in the "Subject Matter and Appellate Jurisdiction" section that "The district court's decision and Final Judgment, which the court rendered on June 20, 2023, disposed of all parties' claims. ROA.345-359."  Br. Appellant at 1.

Patriot cannot show that the district court's finding that White worked overtime hours without compensation is "clearly erroneous" because Patriot does not dispute that White worked overtime hours without compensation.  Not only did Mr. White's undisputed testimony establish that fact, but the work e-mails he sent during times when he was not clocked in foreclose any dispute about whether he worked off-the-clock.

Patriot cannot show that the district court's finding that Patriot had knowledge of White's uncompensated off-the-clock work is clearly erroneous, because Mr. White's supervisor could not dispute Mr. White's testimony that they discussed it regularly, and admitted to one such discussion with Mr. White. ROA.350-352

Patriot cannot show error in the district court's finding that the evidence allowed for a "just and reasonable inference of his actual hours worked." ROA.350.  Patriot argues at pp. 50-51 of its brief that Mr. White's estimate of his

28

hours is "unsubstantiated and speculative," but does not explain how, or why the district court's finding that his estimate was based on "uncontroverted testimony concerning his work schedule, along with examples of emails he sent after he clocked out"[3] was "clearly erroneous."

### B. Patriot's arguments mis-state the law and attempt to create a standard that is contrary to clearly established precedent.

Lacking any evidence or argument that Mr. White did not meet the elements of his off-the-clock overtime claim, Patriot makes several arguments in its brief attempting to hold White to standards that are inconsistent with the law.  These include:

- that White must prove that he was "instructed" not to record time (Appellant Argument Section II)

- that White must show that he was "prevented" or "stopped" from recording time (Appellant Argument section II, V)

- that since White was aware of how to record his time, his claims fail. (Appellant Argument Section II)

- that White did not follow the "rules" for reporting time (Appellant Argument Section III)

- that White must have told someone that he was "due compensation" for time worked off-the-clock (Appellant Argument Section III)

---

[3] ROA.353.

- that White must show that he "complained" about not being paid for hours worked (Appellant Argument Section IV)

- that Patriot was allowed to "assume" that White was reporting all of his time (Appellant Argument Section III)

Patriot made these same arguments to the district court, which rejected them all. While there are many cases, including those cited by Patriot, that discuss each of these principles, none of those cases holds that any of them are dispositive. As the regulations make clear, the reason the employee worked off the clock "is immaterial," and if the employer knows the work is being performed, or even has "reason to believe" it is, "the time is working time." 29 C.F.R. Sec. 785.11. Here, where is settled by uncontroverted testimony that Patriot knew that White worked off-the-clock, but failed to pay him for that time, these other issues are not relevant. Each of these will be addressed in turn.

### 1.    White need not prove that he was "instructed" not to report his time or "prevented" from reporting it.

Patriot contends that an "off-the-clock claim fails if '[t]here is no evidence that Plaintiff was instructed to not record his time or prevented from reporting his time or was directed by Defendant to work off-the-clock without reporting that time.'"  Appellant's Principal Brief at 39-40. In support, Patriot cites *Miller v. Texoma Med. Cntr.*, 2015 WL 5604676, at *6 (E.D. Tex. Sept. 23, 2015) (emphasis added)."  Appellant's Principal Brief at 39-40.  However, neither *Miller* nor any

other case in this Circuit or others holds that an off-the-clock claim "fails" if there was no instruction not to record time, or effort by the employer to prevent the recording of time. While such a showing *could* support a claim for unpaid overtime, it is not necessary for the plaintiff to prove the essential elements of his claim: that the employer knew of the off-the-clock hours and did not pay the employee for them. The court in *Miller* granted summary judgment against the Plaintiff not because she lacked evidence that she was instructed not to report time or prevented from doing so, but instead because the employer did not know that she worked off the clock. The court held: "Without any evidence of the amount or the extent of hours Plaintiff worked without compensation ***or any evidence that Defendant was aware that she worked overtime hours without compensation***, Plaintiff has failed to raise a genuine issue of material fact as to whether she went uncompensated for overtime work and he shall take nothing by his FLSA claim." *Id.* (emphasis supplied).

Indeed, the law places the burden on the employer to ensure that, if it has actual or constructive knowledge of time worked, the time must be paid. There is no requirement that the employer have prevented the employee from inputting time, or instructed the employee not to input the time - if the employer suffered or permitted the employee to work without getting paid, the employer is liable. As the regulations state:

> Work not requested but suffered or permitted is work
> time. For example, an employee may voluntarily
> continue to work at the end of the shift. He may be a
> pieceworker, he may desire to finish an assigned task or
> he may wish to correct errors, paste work tickets, prepare
> time reports or other records. ***The reason is immaterial.
> The employer knows or has reason to believe that he is
> continuing to work and the time is working time.***

29 C.F.R. Sec. 785.11 (emphasis supplied). Here, with White and Herzog openly

discussing White's uncompensated off-the-clock time on multiple occasions, there

can be no dispute that Patriot was aware of White's time spent, and simply did not

pay him for it, violating the FLSA.

> **2.    White need not prove that he "complained" about not being
> paid for off-the-clock time, or told someone he was "due
> compensation."**

Patriot spends many pages arguing that Mr. White never "complained,"

either internally or to the Texas Workforce Commission (the state agency that

enforces the FLSA) that he was not getting paid for his off-the-clock work. *See* Br.

Appellant at 7, 15, 27, 28, 41, 43, 44, 47, 49. However, Patriot cites no case law

indicating that, where the employer has knowledge of off-the-clock work and does

not pay the employee for it, the employee's claim to that compensation fails unless

the employee can show that he complained that he was not being paid. The closest

Patriot gets to citing any case even discussing a lack of complaint is *Jones-Turner

v. Yellow Enterpr. Sys. LLC*, 597 Fed. Appx. 293, 298 (6th Cir. 2015), which Patriot

cites for the proposition: "no evidence of complaints about missed break periods

for which the plaintiffs were not paid, given employer's processes for correction." Br. Appellant at 43. However, *Jones-Turner* does not discuss any lack of complaints by the plaintiffs; indeed, the word "complaint" only appears once in the decision, in the "Facts" section of the decision reciting evidence that "other employees had also complained to [the plaintiffs] about filling out missed-lunch slips for which they were not paid." *Jones-Turner*, 597 F. App'x at 295. Ultimately in *Jones*, as in the other cases cited by Patriot, the court found that the employer could not be held liable because it had no actual or constructive knowledge that the plaintiffs performed uncompensated off-the-clock work. *Jones-Turner*, 597 F. App'x at 298 ("Here, the plaintiffs have not produced evidence that Yellow had either constructive or actual knowledge that they were not receiving compensation for missed meal breaks.")

The FLSA regulations make it clear that the burden is not on the employee to "complain" that he is not being paid for time worked, but on management to ensure that if they are aware of time worked, that time must be paid:

> In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.

29 C.F.R. Sec. 785.13.  Patriot's claim that it "had a right to assume" that White was not working off-the-clock because he did not complain to anybody about not being paid overtime thus fails.  No such "right to assume" exists in the FLSA, when the employer is on notice that the employee is working hours for which he is not being paid.  Accordingly, Patriot's citation to Mr. White's lack of complaining about not being paid for his off-the-clock work is irrelevant to the questions of liability and damages in this case.

Nor would it make sense to require Mr. White to have complained to someone at Patriot that he was "due compensation" for hours worked remotely off-the-clock.  Br. Appellant at 41.  Here, the undisputed evidence is that Mr. White reasonably believed that he was not entitled to compensation for that work, because he had never been told otherwise by the company.  As Patriot points out frequently in its brief, Mr. White was conscientious about following the rules.  And his understanding of the rules while he worked there was that remote off-the-clock work was unpaid.  He testified that he thought he was being paid correctly, and did not know that the law required Patriot to pay him for his off-the-clock work.  ROA.251-252, 943, 979.  His understanding of that was more than reasonable in light of the fact that Patriot did not train its managers in matters of FLSA compliance, and there is no evidence of any written or unwritten rules stating that Patriot hourly employees are supposed to report their off-premise, off-the-clock

work.  Mr. White testified that if he had known that it was illegal for him to work off-the-clock, he would have reported his time, and if he had known that Patriot could get in trouble for having people working but not being paid for time worked, they would have been paid, and Mr. White would have ensured that there was training for his staff to ensure compliance with the law.  ROA.250, 252, 865, 721-722.  Accordingly, Mr. White's failure to complain to anybody at Patriot that he was "due compensation" for time worked off-the-clock does not diminish his claims.

> ### 3. Patriot's "rules" (to the extent they exist) for reporting time make no difference when the employer knows the employee is working off-the-clock and continues to permit it, without pay.

Patriot argues that White's claims fail because he failed to follow "well-established time-reporting policies" - what Patriot characterizes as "the rules."  Br. Appellant at 16, 17, 26, 29, 30, 31, 37, 38, 40, 41, 44, 47.  That argument fails for several reasons.  First, there were no "rules" requiring the reporting or recording of remote, after hours work done for Patriot.  As Mr. White testified, in his experience at Patriot, the rules were that employees were to clock in for work at the facility, clock out after they leave, and not report any time worked remotely.  ROA.251-252, 943, 979.  Second, Mr. White's testimony made it clear that, from his conversations with Eric Herzog, the rules were that he was not to report or get paid for that time.  ROA.350-352. When Mr. White worked at Patriot,

there were no written rules whatsoever addressing the reporting or recording of remote after hours work. ROA.249, 251, 689, 864, 925.   And while it appears that Patriot may have amended its employee handbook to include such a rule later on, Mr. White testified that that handbook provision was not in place when he worked at Patriot, and there is no evidence contradicting that testimony.   ROA.925. Further, the testimony of White, Herzog, and Parley Dixon made it clear that employees, including managers, were not trained in the requirements of the FLSA or how to report or record their time.  ROA.249, 678, 680.

Even if there was such a written "rule," Patriot's knowledge that Mr. White was not complying with it, and continuing to allow him to do so, disposes of the issue with finality.   As the FLSA regulations state:    "it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them. ***The mere promulgation of a rule against such work is not enough.*** Management has the power to enforce the rule and must make every effort to do so."  29 C.F.R. Sec. 785.13 (emphasis supplied).  Thus, even if there was a written rule instructing Mr. White to record and report all of his remote, after hours work, Patriot's lack of enforcement of that rule with respect to Mr. White, when Mr. Herzog and others knew that he worked off-the-clock makes the rule irrelevant.

### 4.    White did not "deliberately evade" Patriot's policies

Patriot claims that White "deliberately evaded" Patriot's compensation policies when he worked off-the-clock.  Br. Appellant at 45-46.  The case law is clear that an employee who deliberately evades the employer's timekeeping polices cannot later come back and claim that he is due overtime pay.  However, this is not a "deliberate evasion" case.  How could it be, when even Patriot's own witness, Eric Herzog, testified that White told him that he was working off-the-clock for no pay, and the two men openly discussed White's uncompensated work time regularly.

### 5.    White's awareness of how to report time is irrelevant.

Patriot argues further that since White was aware of how to record his time, his claims fail.  Br. Appellant at 16, 41, 51.  However, Mr. White's testimony regarding his understanding of what time needed to be reported, in combination with the lack of policies, procedures, and training, and his conversations with Eric Herzog about his unpaid off-the-clock activities do not allow Patriot to rely on Mr. White's "awareness" of how to clock in and out, or have his timesheet corrected.  It is undisputed that Mr. White's reasonable understanding of the rules at Patriot was that he was only to report time worked at the Patriot facility.  He knew the process for doing so, and for having his timesheets and those of his staff members corrected.  However, that fact has no bearing on whether he meets the essential

elements of his claim: that Patriot knew he worked off-the-clock and did not pay him for that time.

### 6. White's evidence is legally sufficient.

The last section of Patriot's principal brief argues that the evidence adduced at trial was "legally insufficient" to support Mr. White's claims.

Patriot first argues that "the Fifth Circuit has rejected the notion that constructive knowledge can be based on what the employer 'could have potentially discovered.'" Br. Appellant at 49 (citing *Fairchild v. All Am. Check Cashing, Inc.*, 815 F.3d 959, 965 (5th Cir. 2016)). The district correctly articulated the standard for constructive knowledge thus: "an employer has constructive knowledge of an employee's overtime work if it would have become aware of that work through reasonable diligence." ROA347-348 (citations omitted). This Court in *Fairchild* held that the employer did not have constructive knowledge of the employee's off-the-clock work because the plaintiff "intentionally failed to report her unauthorized overtime ***specifically because All American prohibited such overtime***" and the fact that management "could have" looked at computer records to see that the plaintiff had indeed worked after hours did not establish constructive knowledge because the employer would have had no reason to believe the plaintiff was working after hours, since she intentionally hid that fact. *Fairchild,* 815 F.3d at 965 (emphasis added).

Here, by contrast, the district court correctly found that Patriot had constructive knowledge of Mr. White's off-the-clock work because everyone in Mr. White's management chain - Herzog, Swor, and Dixon - communicated with Mr. White after hours and therefore "had reason to know" that he was working off-the-clock.  ROA.352-353.  Indeed, Mr. White testified that he liked for them to know that he was working late into the night, because, as with his conversations about his unpaid overtime with Eric Herzog, it showed he was a "Patriot lifer" dedicated to do whatever was necessary to ensure the company's success. ROA.857-858.

Patriot also argues in that section of its Principal Brief that Mr. White's "commiseration" with Eric Herzog about working long hours is insufficient as a matter of law to establish knowledge.  However, as the district court correctly found, White and Herzog were not simply "commiserating" about long hours, but about the fact that if Mr. White had actually been being paid for each hour he worked, he would have made more money than he was making.  ROA.246, 852-853.  That commiseration, when combined with White's other testimony about his discussions with Herzog about his off-the-clock work and Herzog's admission that White reported his underreporting of hours, fully supports the district court's conclusion that Patriot knew of Mr. White's off-the-clock work activities.

Patriot states at the conclusion of its argument section: "'the Fifth Circuit has made clear that *de minimus* time is not compensable.'" *See Von Friewalde,* 339 Fed. Appx. at 454 (*de minimus* claims are disregarded)." Br. Appellant at 46. That is a true statement, but eight hours per week of unpaid time over a three-year period is not *de minimis*. *Friewalde v. Boeing Aerospace Operations, Inc.*, 339 F. App'x 448, 454 (5th Cir. 2009)(*de minimis* work involves "only a few seconds or minutes of work beyond the scheduled working hours.")

## XI.    CONCLUSION

For the reasons stated above, the judgment of the district court should be affirmed.

Respectfully submitted,


THE LAW OFFICES OF KELL A. SIMON
501 North IH-35, Suite 111
Austin, Texas 78702
(512) 898-9662 Telephone
(512) 368-9144 Facsimile


/s/ Kell A. Simon
Kell A. Simon
State Bar No. 24060888
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I do hereby certify that on December 23, 2023, a true and exact copy of the foregoing document was filed through the Court's CM/ECF which will send notice to the following counsel of record:

Andrea M. Johnson
Texas State Bar No. 10679600
KANE RUSSELL COLEMAN LOGAN PC
5051 Westheimer Road, Suite 1000
Houston, Texas 77056
Phone: (713) 425-7433
Fax: (713) 425-7700
Email: ajohnson@krcl.com

/s/ Kell A. Simon
Kell A. Simon

<u>CERTIFICATE OF COMPLIANCE</u>

   1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 9,718 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

   2. This brief complies with the typeface requirements in Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it uses a proportionally spaced typeface using in Times New Roman, 14-point font for text, and 12-point font for footnotes.

   3. This brief complies with the privacy-redaction requirement of Fifth Circuit Rule 25.2.13. Personal identifiers are redacted in accordance with the rules.

   4. This brief complies with the electronic-submission requirement of Fifth Circuit Rule 25.2.1 because it is an exact copy of the paper document.

  DATED:

     *s/ Kell A. Simon*
     Kell A. Simon

     ATTORNEY FOR APPELLANT
     ROBERT WHITE